

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-20-00405-CR

Barry William **UHR**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 187th Judicial District Court, Bexar County, Texas
Trial Court No. 2019CR7090
Honorable Stephanie R. Boyd, Judge Presiding

Opinion by:    Lori I. Valenzuela, Justice

Sitting:    Patricia O. Alvarez, Justice
Luz Elena D. Chapa, Justice
Lori I. Valenzuela, Justice

Delivered and Filed: August 18, 2021

AFFIRMED

A jury convicted Barry Uhr of continuous violence against the family. On appeal, Uhr asserts the indictment is insufficient, there is legally insufficient evidence of a reckless mental state, and that he is entitled to a new trial either because of juror misconduct or improper impeachment of a defense character witness. We affirm.

## BACKGROUND

The crime of continuous violence against the family requires the State to prove beyond a reasonable doubt that, during a period that is 12 months or less in duration, the defendant two or

more times criminally assaulted persons who (1) are family, (2) reside in the same household, or (3) date the defendant. *See* TEX. PENAL CODE § 25.11. Uhr's conviction is based on two incidents occurring six months apart. The second incident is not contested on appeal. The issues in this appeal primarily relate to the first incident; specifically, the indictment and whether Uhr's actions recklessly resulted in injury to his eighteen-month-old daughter, S.H.[1]

For years prior to the first incident, Uhr maintained an off-and-on relationship with Amanda Hamel. While dating, Hamel became pregnant with S.H. In October 2017, Hamel moved to San Diego, California, so that her family could help raise S.H. Uhr was largely absent during the first year of S.H.'s life. But on S.H.'s first birthday, Uhr unexpectedly appeared at her birthday party in San Diego. With Hamel's approval, Uhr began to build a relationship with S.H. Hamel likewise began rebuilding a relationship with Uhr.

In late May 2018, Hamel and S.H. visited Uhr for two weeks. On the afternoon of June 2, 2018—the last day of Hamel and S.H.'s trip—Uhr and Hamel planned to socialize with Uhr's friends at a family-friendly outdoor venue that served food and alcohol. En route to the venue, Hamel incidentally saw an incoming text on Uhr's cell phone from "Jen Foxxx." Hamel believed the name "looked like a stripper's name." Hamel was "confused, shocked and disgusted" because Hamel believed she and Uhr maintained an exclusive relationship aimed at building a family together. While at the venue, Hamel ignored Uhr and played with S.H.

On their drive back to Uhr's home, Uhr confronted Hamel about the way she acted at the venue. She explained she saw the text from "Jen Foxxx" and her assumptions. Uhr angrily maintained she was jumping to conclusions. During their verbal argument, Hamel became concerned about Uhr's "crazy" driving. Hamel picked up her phone and told Uhr he needed to

---

[1] To protect the identity of the minor child, we refer to the child by her initials. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8.

remember S.H. was in the backseat, and if he did not slow down, she would call someone for help. Uhr slapped the phone out of her hand, and it landed out of Hamel's reach on the driver's side floor. Hamel told Uhr she was scared and was going to lean down and get her phone. He said she did not need her phone and she was not calling anyone. In response, Hamel picked up Uhr's phone and told him she did not need his passcode to make an emergency call. He hit the second phone out of her hand, and it again landed on the driver's side floor. Hamel then told Uhr he needed to remember she carried S.H.'s birth certificate with her everywhere she went, and his name was not on it. Uhr responded Hamel needed to remember she would be trespassing when they arrived at his home. Afraid, Hamel crawled into the backseat to be with S.H. for the remainder of the drive.

After arriving at his home, Uhr parked inside the garage. Hamel got out of the backseat of the truck with S.H. and went to the driver's side to retrieve her phone from the floor. The truck was locked and Uhr refused to unlock it. With S.H. in her arms, Hamel began walking towards the garage door to leave. Uhr pushed Hamel against a car parked outside the garage, told her she was not going to leave, and took S.H. away from her. With S.H. in his arms, Uhr went inside the garage, leaving Hamel outside.

Uhr reached up to press a button to close the garage door. The button is located very high in the sizable garage, and Uhr had to "stand on his tippy-toes" to push the button.[2] Believing Uhr wanted to close himself in the garage with S.H.—locking Hamel outside—Hamel "pulled his shirt to try to get him on the outside of the garage with [her]. And when [she] did that -- when -- [she] pulled his shirt to try to get him on the outside of the garage with [her], he swung around to push [her]. And when he swung to push [her], [S.H.]'s head cracked against the garage door frame." After Hamel's pull, "He just kind of did like a one-step forward thing, like when you lose your

---

[2] In his free time, Uhr works on cars out of a garage able to comfortably store many cars. A series of large garage doors span the sides of the garage.

footing." S.H. was being held on Uhr's left side, and with the turn of his body, S.H.'s head hit the garage door track, injuring S.H.[3] Hamel would later repeatedly describe the incident to police (and third parties) as an "accident."

After S.H.'s injury, Hamel and Uhr ended up in the backyard. When Hamel again tried to take S.H. from Uhr, he shoved her away and told her if she called the police, he was going to lose his job and then "everything would be over." Hamel begged Uhr to return S.H. Uhr responded by throwing a beer can at Hamel that knocked her glasses off. Hamel fled and obtained help from a stranger driving on a nearby road. After calling the police, she returned alone to Uhr's home, and Uhr returned S.H. to Hamel. The police later arrested Uhr.

The grand jury issued a true bill of indictment on two counts, although the State proceeded to trial on only count one (continuous violence against the family), which stated:

> on or about the [sic] June 2nd, 2018, BARRY UHR, hereinafter referred to as defendant, did then and there recklessly cause bodily injury to [S.H.], a member of the defendant's FAMILY AND HOUSEHOLD, by striking [S.H.]'s head against a garage door track and on or about the [sic] December 2nd, 2018, the defendant did then and there intentionally, knowingly, or recklessly cause bodily injury to Alison Culpepper, a member of the defendant's FAMILY, HOUSEHOLD, OR A PERSON WITH WHOM THE DEFENDANT HAS OR HAS HAD A DATING RELATIONSHIP, by striking Alison Culpepper with the hand of the defendant, and said conduct by the defendant occurred during a period that was 12 months or less in duration;

Uhr's jury trial lasted four days. At trial, the State called Hamel; a responding officer to the first incident; Alison Culpepper (the complainant in the second incident); and a responding officer to the second incident. The State admitted into evidence photographs of Uhr's property and the complainants' injuries; Culpepper's 911 call; and complainant medical records. Uhr called

---

[3] S.H.'s injuries were minor: She had a small laceration above her left eyebrow with a "distinct line" that "never really bled," and a large hematoma (colloquially called a "knot" or "goose egg").

seven character witnesses. The jury found Uhr guilty of continuous violence against the family. After sentencing, Uhr filed a motion for new trial based on jury misconduct. The trial court denied the motion and this appeal ensued.

SUFFICIENCY OF INDICTMENT

Uhr asserts that the trial court erred in failing to set aside the indictment as insufficient. We agree that the indictment is insufficient but find the error harmless.

### Standard of Review

We review a trial court's decision on a motion to quash an indictment de novo because the sufficiency of a charging instrument is a question of law. *State v. Rosseau*, 396 S.W.3d 550, 555 n.6 (Tex. Crim. App. 2013); *Estrada v. State*, 04-20-00059-CR, __ S.W.3d __, 2021 WL 2669334, at *2 (Tex. App.—San Antonio June 30, 2021, no pet. h.); *State v. Castorena*, 486 S.W.3d 630, 632 (Tex. App.—San Antonio 2016, no pet.).

In all criminal prosecutions, the defendant has the right to demand the nature of the cause of action against him, and to have a copy thereof. TEX. CONST. art. 1, § 10; *State v. Mays*, 967 S.W.2d 404, 405 (Tex. Crim. App. 1998). While an indictment does not need to allege facts that are merely evidentiary in nature, where the State charges the accused acted recklessly in the commission of an offense, as here, the indictment must also "allege, with reasonable certainty, the act or acts relied upon to constitute recklessness." *Smith v. State*, 309 S.W.3d 10, 14 (Tex. Crim. App. 2010); TEX. CODE CRIM. PROC. art. 21.15.

An indictment is sufficient so long as (1) it confers jurisdiction on the trial court to pronounce judgment and (2) an ordinary person can understand what it means and what the offense is. TEX. CODE CRIM. PROC. art. 21.11. An indictment must be specific enough for the defendant to prepare a defense, and the sufficiency of the indictment will be tested on its own terms—"in a

vacuum, so to speak." *Adams v. State*, 707 S.W.2d 900, 901 (Tex. Crim. App. 1986). We engage in a two-step inquiry. *Estrada*, 2021 WL 2669334, at *2.

We first assess whether the indictment failed to convey some requisite item of "notice." *Adams*, 707 S.W.2d at 903; *Estrada*, 2021 WL 2669334, at *2. When recklessness is an element of the offense, the indictment must "allege the *circumstances* of the act which indicate that the defendant acted in a reckless manner." *State v. Rodriguez*, 339 S.W.3d 680, 685 (Tex. Crim. App. 2011) (emphasis in original). Alternatively, "[a]n alleged inherently reckless act satisfies the requirements of article 21.15." *Tata v. State*, 446 S.W.3d 456, 463 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (citing *Smith*, 309 S.W.3d at 16). If the indictment provides sufficient notice, our inquiry ends. *Adams*, 707 S.W.2d at 903; *Estrada*, 2021 WL 2669334, at *2.

If the indictment does not provide sufficient notice, we next decide whether, in the context of the case, the failure impacted the defendant's ability to prepare a defense, and, if so, how great an impact. *Adams*, 707 S.W.2d at 903. That is, we review the record for prejudice to appellant's substantial rights. *Id.*

*Analysis*

Our sufficiency review is limited to the face of the indictment. *Id.* at 901. Here, the indictment charged, in relevant part, "on or about the [sic] June 2nd, 2018, BARRY UHR . . . recklessly cause[d] bodily injury to [S.H.] . . . by striking [S.H.]'s head against a garage door track." This language does not satisfy the State's burden to allege both an act and the circumstances indicating recklessness. *See Rodriguez*, 339 S.W.3d at 685. An ordinary person would not understand from the indictment how the setting or circumstances rendered the striking of S.H.'s head to be criminally reckless. *See id.*; TEX. CODE CRIM. PROC. art. 21.11.

In a vacuum, the act of striking a child's head on a garage door track is neither necessarily criminal nor inherently reckless. *See Adams*, 707 S.W.2d at 901; *Smith*, 309 S.W.3d at 12; *Tata*,

446 S.W.3d at 463. Garage door tracks are a normal part of many homes and, with respect to striking, indistinguishable from other typical household fixtures (e.g. corners or doors) and objects (e.g. tables and bedframes) on which a parent might accidentally strike their child's head. The indictment also does not identify any circumstances indicating Uhr's garage or garage door track were particularly dangerous or risky. The indictment is facially insufficient.

Because we find the indictment facially insufficient, we must next determine whether, in the context of the case, the failure impacted Uhr's ability to prepare a defense, and, if so, how great the impact was. *Adams*, 707 S.W.2d at 903. We disregard error unless it affected Uhr's substantial rights. *Flores v. State*, 536 S.W.3d 560, 572 (Tex. App.—San Antonio 2017, pet. ref'd); TEX. R. APP. P. 44.2(b) ("Any [non-constitutional] error . . . that does not affect substantial rights must be disregarded.").

Uhr asserts that the State's inconsistent argument and presentation of facts leading up to S.H.'s injury hindered his ability to prepare a defense. We disagree. The indictment charged one specific act occurring only one time on one day, June 2, 2018. *Cf. State v. Moff*, 154 S.W.3d 599, 603 (Tex. Crim. App. 2004) (affirming quashed indictment alleging chief appraiser of county appraisal district made numerous unidentified illegal purchases over the course of six years). Uhr was one of two competent witnesses present at the time of the incident. Given no other witnesses, Uhr's counsel capably and effectively attempted to discredit Hamel's testimony as a viable strategy in support of Uhr's defense. *See Flores*, 536 S.W.3d at 573. In reviewing the record, we hold that the trial court's error in denying Uhr's motion to set aside the indictment was harmless. *See id.* Finding no harm, we overrule this issue.

LEGAL SUFFICIENCY OF EVIDENCE

Uhr challenges the legal sufficiency of the evidence of a reckless mental state when Uhr struck S.H.'s head against a garage door track. Uhr's conviction of continuous violence against

the family required the State to prove two or more incidents of family violence occurred within a twelve-month period. *See* TEX. PENAL CODE § 25.11. Because the State relied on only two incidents, if Uhr did not recklessly strike S.H.'s head against a garage door track, his conviction must be reversed.

### *Standard of Review*

We review the evidence in the light most favorable to the verdict. *Romano v. State*, 610 S.W.3d 30, 34 (Tex. Crim. App. 2020). This standard applies whether the case was proven by direct or circumstantial evidence. *Id.* We must defer to the fact-finder's findings and determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Id.* The fact-finder is responsible for judging the credibility of witnesses and may find credible all, some, or none of the testimony that the witnesses give. *Id.* We may not re-evaluate the weight and credibility of the record evidence and substitute our judgment for the jury. *Brooks v. State*, 323 S.W.3d 893, 902 (Tex. Crim. App. 2010). If the evidence falls within a zone of reasonable disagreement, we must assume jurors made all inferences in favor of the verdict and disregard other possible inferences. *Id.* at 922.

### *Recklessness*

To sustain a conviction for reckless injury to a child, as applicable here, the evidence must prove a defendant recklessly, by act or omission, caused bodily injury to a child. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) (citing TEX. PENAL CODE § 22.04(a)(1)). Reckless injury to a child is a result-oriented offense requiring a mental state that relates not to the specific conduct but to the result of that conduct. *Id.*; *Alvarado v. State*, 704 S.W.2d 36, 38–39 (Tex. Crim. App. 1985) (en banc). The defendant must be aware of but consciously disregards a substantial and unjustifiable risk that the result will occur. *Williams*, 235 S.W.3d at 750; TEX. PENAL CODE § 6.03(c).

To determine whether a defendant's act involves a substantial and unjustifiable risk, we examine the events and circumstances from the viewpoint of the defendant at the time the events occurred, without viewing the matter in hindsight. *Williams*, 235 S.W.3d at 753 (quoting *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 23 (Tex. 1994)). The magnitude of the risk must be determined by the conduct itself and not by the resultant harm. *Id.* Mere lack of foresight, stupidity, irresponsibility, thoughtlessness, ordinary carelessness, however serious the consequences may happen to be, does not rise to the level of criminal recklessness. *Id.* at 751. Recklessness can be inferred from the acts, words, and conduct of the accused. *Lee v. State*, 21 S.W.3d 532, 540 (Tex. App.—Tyler 2000, pet. ref'd); *Williams v. State*, 04-19-00673-CR, 2020 WL 6597542, at *4 (Tex. App.—San Antonio Nov. 12, 2020, no pet.) (citing *Dues v. State*, 634 S.W.2d 304, 306 (Tex. Crim. App. 1982) and *Griffith v. State*, 315 S.W.3d 648, 651-52 (Tex. App.—Eastland 2010, pet. ref'd)).

*Analysis*

This case presents troubling and difficult issues on the elusive, substantive element of the culpable mental state of recklessness. *See Williams*, 235 S.W.3d at 763 (describing as "elusive" the distinction between civil negligence, criminal negligence, and criminal recklessness). But the standard of review we are bound to apply and the record leads to one result: We hold there is legally sufficient evidence of Uhr's reckless mental state. At trial, Hamel testified to the following pertinent facts:

- Uhr and Hamel engaged in a verbal argument while returning to Uhr's home.

- After parking in Uhr's garage, Hamel indicated she was leaving with S.H. and began walking towards the garage door.

- Uhr initiated a physical altercation by pushing Hamel against a car parked outside the garage and forcibly took S.H.

- With S.H. in his arms, Uhr went inside the garage and reached up to press a button to close the garage door.

- Believing Uhr wanted to close himself in the garage with S.H.—locking Hamel outside—Hamel pulled Uhr's shirt to try to get him outside of the garage with her.

- When Hamel pulled Uhr's shirt, he "did like a one-step forward thing, like when you lose your footing."

- Uhr "swung" to push Hamel away, and when he swung to push her, S.H.'s head cracked against the garage door frame, injuring S.H.[4]

Urging us to consider *all* the facts in our legal sufficiency review, Uhr essentially argues there is only one inference a rational jury could have reached: Uhr lacked the requisite culpable mental state because Hamel pulled Uhr's shirt, causing Uhr to trip, resulting in S.H.'s injury. Yet, we are required to view these facts in the light most favorable to the verdict, and we may not re-evaluate the weight and credibility of the evidence to substitute our judgment. *Romano*, 610 S.W.3d at 34; *Brooks*, 323 S.W.3d at 902.

In judging Hamel's credibility, the jury may find credible all, some, or none of her testimony. *Romano*, 610 S.W.3d at 34. Thus, the jury could have believed only the portions of Hamel's testimony favorable to the verdict, for example:

- Uhr initiated a physical altercation by pushing Hamel against a car parked outside the garage and forcibly took S.H.

- With S.H. in his arms, Uhr went inside the garage and reached up to press a button to close the garage door.

- Then, with S.H. in his arms, Uhr engaged in a physical alteration when he "swung" to push Hamel away, and when he swung to push her, S.H.'s head cracked against the garage door frame, injuring S.H.

The State asserts that Uhr was reckless because (1) he knew he was holding S.H. (an eighteen-month old toddler) when he forcibly took S.H. from Hamel immediately before the act

---

[4] There is no testimony that Uhr actually pushed Hamel; rather, Hamel's testimony establishes only that she *believed* Uhr turned to push her.

resulting in her injury; (2) he knew he was standing inside his garage beside the garage door track because the button was located beside the track; and (3) in his haste to turn and hit Hamel, he ignored the risk of hitting S.H.'s head.

To determine whether Uhr's acts involved a substantial and unjustifiable risk, we review the events and circumstances favorable to the verdict from Uhr's viewpoint at the time the events occurred, without viewing the matter in hindsight. *Williams*, 235 S.W.3d at 750. We begin by looking to the conduct itself: While holding a toddler in one arm and standing on his "tippy-toes" near the garage door track, Uhr engaged in a physical altercation by turning to push Hamel.

The jury could have rationally inferred that Uhr created and consciously disregarded a risk of injury by engaging in a physical altercation while holding a toddler. The jury could have believed that Uhr did not "giv[e] a damn" whether the toddler in his arm would face a minor injury because his focus was on his fight with Hamel. *See id.* at 751–52 ("Such a 'devil may care' or 'not giving a damn' attitude toward the risk distinguishes the culpable mental state of criminal recklessness from that of criminal negligence, which assesses blame for the failure to foresee the risk that an objectively reasonable person would have foreseen.").

A reasonable person does not engage in a physical altercation while holding a toddler. Or as the State puts it, "Anyone who takes a baby from another person should know to do so carefully, not as if grabbing a football. Anyone holding a baby should know to move carefully when near a hard object like a garage door track."

The State asserts that Uhr's erratic driving on the way to his home and Uhr's subsequent conduct are additional circumstantial evidence of Uhr's reckless mental state. We cannot consider either. While Uhr's erratic driving may have been independently reckless, it bears no relationship

to the act of striking S.H.'s head on the garage door track.[5] And we do not consider Uhr's subsequent conduct because we must look "at the time the events occurred, without viewing the matter in hindsight." *Williams*, 235 S.W.3d at 750.

We agree with the State's implicit argument that S.H.'s age is material to assessing a reasonable standard of care. The jury could have rationally concluded Uhr grossly deviated from that reasonable standard of care by turning to push Hamel while holding S.H. In other words, there is legally sufficient evidence from which a jury could infer a reckless mental state. We overrule this issue.

### JUROR MISCONDUCT

Uhr asserts the trial court erred in denying his motion for new trial based on juror misconduct under Texas Rules of Appellate Procedure 21.3(f) and 21.3(g). It is undisputed that one juror conducted an internet search on Uhr the day before the jury began its deliberations. Determining no reasonable possibility that what the juror saw on the internet would have altered the verdict of a hypothetical average juror, the trial court found:

> The "nature" of the information learned from [the juror] is difficult to assess from the evidence presented. [The juror] "Googled" the Defendant's name, but he did not testify about what it was that he saw on the internet. It sounded like [the juror] saw the same information that he heard during the trial – allegations of abuse by the two complaining witnesses. His testimony regarding two other unnamed purported complainants was contradictory and vague. In addition, [the juror] did not relay anything that he saw on the internet to other jurors. Thus, this court finds that [the juror]'s testimony is somewhat discredited based on it being vague, inconsistent, and evasive – although [the juror] admitted to looking on the internet for information, he was not specific about what he saw or read.

---

[5] *Cf. Campbell v. State*, 551 S.W.3d 371, 376–77 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (erratic driving evidence of reckless mental state where driver dangerously tailed on-foot complainant).

### *Standard of Review*

A trial court abuses its discretion in denying a motion for new trial when no reasonable view of the record could support the trial court's ruling. *McQuarrie v. State*, 380 S.W.3d 145, 150 (Tex. Crim. App. 2012). We view the evidence in the light most favorable to the trial court's ruling and presume that all reasonable factual findings that could have been made against the losing party were made against that losing party. *Colyer v. State*, 428 S.W.3d 117, 122 (Tex. Crim. App. 2014). The trial court alone determines the credibility of the witnesses. *Id.* Even if testimony is uncontroverted or subjected to cross-examination, the trial court has discretion to disbelieve that testimony. *Id.*

### *Analysis—Texas Rule of Appellate Procedure 21.3(f)*

In relevant part, a defendant must be granted a new trial "when, *after retiring to deliberate*, the jury has received other evidence." TEX. R. APP. P. 21.3(f) (emphasis added). Here, the juror conducted internet research—receiving other evidence—*before* deliberations.

Uhr asserts we should follow our sister court and apply the spirit, if not the letter, of the rule. In *Hayes v. State*, the bailiff commented to the jury that the parties were discussing a plea bargain before deliberations began. 484 S.W.3d 554, 556 (Tex. App.—Amarillo 2016, pet. ref'd). Because the jury had not yet retired to deliberate, the court acknowledged the case "may not fall squarely within the verbiage of Rule 21.3(f)" but nevertheless applied the "legal and analytical framework" of the rule. *Id.*

In construing rules of procedure, we apply the same rules of construction that govern statutory interpretation. *Ford Motor Co. v. Garcia*, 363 S.W.3d 573, 579 (Tex. 2012). We look to the plain language of the rule and construe it according to its plain or literal meaning. *Id.* Because *Hayes* fails to apply the literal meaning of Rule 21.3(f)—expressly predicated on the jury improperly receiving evidence *after* retiring to deliberate—we decline to follow it. Construing the

rule as Uhr urges would essentially re-write the rule to omit the words "after retiring to deliberate," although those words were presumably included for a reason.

The record supports the trial court's findings that the juror (1) conducted research before deliberations began and (2) did not share the substance of his research with other jurors after deliberations began. Applying the plain language of Rule 21.3(f), we cannot conclude the trial court abused its discretion in denying Uhr's motion for new trial on the basis of Texas Rule of Appellate Procedure 21.3(f). We overrule this issue.

### *Analysis—Texas Rule of Appellate Procedure 21.3(g)*

A defendant must be granted a new trial "when the jury has engaged in such misconduct that the defendant did not receive a fair and impartial trial." TEX. R. APP. P. 21.3(g). Uhr asserts that the juror's testimony at the motion for new trial and answers in voir dire establish that the juror was biased against Uhr throughout the trial, depriving Uhr of a fair and impartial trial.

We are satisfied, on this record, that Uhr received a fair and impartial trial. The trial court found the juror's testimony at the motion for new trial discredited based on its vagueness, inconsistency, and evasiveness. We cannot reassess the trial court's credibility determinations; the trial court alone has discretion to believe or disbelieve the juror's testimony. *Colyer*, 428 S.W.3d at 122. As we have stated, the record also supports the trial court's finding that the juror did not relay anything he saw on the internet to other jurors. Considering the totality of the record and the trial court's findings, we cannot conclude the trial court abused its discretion in denying Uhr's motion for new trial on the basis of Texas Rule of Appellate Procedure 21.3(g). We overrule this issue.

### IMPROPER IMPEACHMENT

Uhr asserts that the trial court erred in overruling his objection to the prosecutor's impeachment of a character witness with allegations that concerned the facts of the instant case.

Because the asserted error is non-constitutional, we cannot reverse unless the error affected Uhr's substantial rights. TEX. R. APP. P. 44.2(b); *Llamas v. State*, 12 S.W.3d 469, 471 n.2 (Tex. Crim. App. 2000) (harm analysis requires consideration "whether the error had a substantial or injurious affect on the jury verdict"). After being asked whether his opinion would change if he learned that Uhr struck a woman (Culpepper), the witness responded:

> My answer to you would be this: Certainly an allegation would not change my opinion of Barry. I've got 18 years of knowing this man. I have no reason to believe that he would ever do anything that – that this allegation states. Obviously, if he could prove to me that this is something he did, I might change my opinion. But I've known this man for 18 years. An allegation or a hearsay or something that someone said is not going to change my opinion or belief in what Barry is saying.

Assuming without deciding the question was improper, on this record, we find no harm. We cannot say that Uhr's substantial rights were affected by this one question of one witness. This witness was one of seven character witnesses called by Uhr. The witness answered the question by stating the allegation would not change his opinions of Uhr's character that developed over eighteen years of knowing him. The witness reiterated his opinion of Uhr as peaceful on redirect. We conclude this question had no injurious affect on the verdict. *See Llamas*, 12 S.W.3d at 471 n.2. The jury reached its verdict after receiving testimony from four fact witnesses and evidence, including pictures of complainant injuries, medical documents outlining complainant injuries, and Culpepper's 911 call, over the course of the four-day trial. We overrule this issue.

### CONCLUSION

Each of Uhr's issues having been overruled, the judgment of the trial court is affirmed.

Lori I. Valenzuela, Justice

DO NOT PUBLISH